ANNA M. HANSON v. GEORGE A. NEAL and
THOMAS R. LANE, Appellants.

In Banc, December 16, 1908.

1. **MISJOINDER OF CAUSES: Motion to Elect: Waiver.** A motion to elect, based on a misjoinder of two separate causes of action, is waived by answering over to the merits.

2. ————: **Set Up As a Defense in Answer.** A misjoinder of parties and causes of action cannot be raised by pleading misjoinder in the separate answers of defendants, at least where the petition on its face discloses such defect.

3. ————: **Setting Aside Trustee's Sale and Deed: Joint Enterprise.** Where the suit is to set aside a trustee's sale under a deed of trust of certain lands, the whole being sold at one sale and one bid, with deeds made—in furtherance of the common enterprise and joint venture of two defendant purchasers— of one part to one of them and another part to the other, they can be joined in one suit depending on the same evidence.

4. **EQUITY: Admissibility of Evidence.** In an equity case the admission or exclusion of evidence is rarely reversible error on appeal.

5. ————: ————: **Compromise.** It will be assumed on appeal that the rights of appellant in the equity suit were not prejudiced by the admission of testimony looking to a compromise.

6. ————: ————: **Suit to Set Aside Mortgage Sale: Additional Security.** In the suit to set aside the trustee's sale under a deed of trust of certain lands, the exclusion of testimony offered by defendants that the mortgagors gave a mortgage on other land and that the deed of trust under which the land was sold was additional security, is not reversible error. If material, there was better evidence of it than oral testimony.

7. ————: ————: ————: **Testimony of Antecedent Cloud on Title.** A defendant, in the suit to set aside a mortgage sale, should not be permitted to testify that there was a cloud upon the title at the time of the sale—for two reasons: First, because its tendency is to permit the opinion of the witness to take the place of the fact itself, and if the clould existed there is a better way to prove it; and, second, because no man should be permitted to retain land acquired at an invalid and unfair sale by disparaging title through assumption.

8. **SETTING ASIDE MORTGAGE SALE: Decree: Restoring Bid Money.** A decree which sets aside a sale under a deed of trust and the trustee's deed to the purchasers is not equitable unless it restores to them the money paid by them at the trustee's sale. They are entitled to be put in the same situation they were before the sale, as far as practicable. And where the amount of the bid was tendered to the plaintiff beneficiary and not accepted, the decree should require plaintiff to pay to the purchasers the expenses of the sale paid by them.

9. ——: **Clean Hands.** The fact that on the day of the sale under the deed of trust the beneficiary's agent, in the absence of his principal and of his own motion, tried to induce the purchasers to deed the property to the beneficiary for a bonus of $25, does not show that the beneficiary who seeks to have the sale set aside comes into court with unclean hands. If the proposition had been accepted, and the mortgagor were complaining, a different question might be present.

10. ——: **Duty of Trustee.** The trustee making the sale in the foreclosure of a deed of trust is the agent both of the mortgagor and the *cestui que trust.* His primary and bounden duty is to make the sale to their interests—not to drum up crowds of speculators in lands and make the sale at a time that best suits them, in disregard of the interests of his principals.

11. ——: **Untimely Hour of Sale: Inadequacy of Price.** Inadequacy of consideration as a general rule is not of itself a sufficient ground for setting aside a foreclosure sale under a deed of trust; but when the sale was made at 11:15 in the morning when the usual hour was between one and three, and the mortgagor testified that he was not present because of the untimely hour, and the *cestui qui trust*, detained by late trains from arriving at the place of sale until 11:40, notified the trustee over the telephone on the previous day to postpone the sale until his arrival and that request was ignored, and the trustee made the sale at the untimely hour at the request of the purchasers and to suit their pretended convenience, which is shown to be a mere pretext and cloak, and the property was permitted to pass to their hands at a very small per cent of its real value and at a sum much less than the debt secured, the sale is unconscionable and will be set aside at the suit of the *cestui qui trust*. In such case the sale was not made in the interests of the trustee's principals, but in collusion in the form of a wrongful combination for an improper purpose.

12. **DEMURRER: No Exception:    Waiver.** It is not necessary to save an exception to the overruling of appellant's demurrer to the petition, in order to have it considered on appeal. But

215 Sup—17

defendant by answering over waives every objection raised by the demurrer to the petition except the question of jurisdiction and the objection that the petition does not state facts sufficient to constitute a cause of action.

13. ————: **No Cause of Action.** But where the grounds of the demurrer are that there is a misjoinder of parties in the petition and a misjoinder of causes of action, coupled with the added clause that "it appears by the plaintiff's own showing by said bill that she is not entitled to the recovery or relief prayed for by the bill against these defendants," the demurrer does not with certainty make the objection that the petition does not state facts sufficient to constitute a cause of action. The purpose of the statute governing demurrers was to sharply direct the trial court's attention to the precise ground of objection relied upon.

14. **SUIT TO SET ASIDE MORTGAGE SALE: By Mortgagee: Pleading: Solvency of Mortgagor: Equity: Jurisdiction.** Whether or not it was necessary for plaintiff, the beneficiary in a deed of trust, in her suit to have the foreclosure sale set aside as improper and in fraud of her rights, to allege in her bill that the payor of the secured notes was solvent, is a jurisdictional question, for its determination involves a determination of the question of whether or not she had an adequate remedy at law, and in consequence the sufficiency of the petition can be raised for the first time on appeal. But to maintain such a suit it was not necessary for her to allege the mortgagor's insolvency. The suit is to re-establish the lien of a deed of trust exhausted and lost by an unfair and wrongful sale, and to vest out of the purchasers at such sale and to vest into the trustee the legal title to the land, to be held by him as security for the payment of the secured notes, whose owner has no legal remedy to that end. Nor does it lie in the mouth of the purchasers who got the title unfairly, to insist that she can sue on the notes and obtain judgment and execution in a court of law against the payor of the debt. She is entitled to both remedies and should not be deprived of either. Whether the debtor is solvent is a necessary matter neither of pleading nor proof.

Appeal from Ripley Circuit Court.—*Hon. W. N. Evans,* Judge.

REVERSED AND REMANDED (*with directions*).

*John M. Atkinson* for appellants.

The court below erred in not sustaining appellants' demurrer to the bill of respondent on the ground that it did not state a cause of action. We again challenge the bill of respondent in this court on the ground that it does not state a cause of action; that it appears on the face of the bill that respondent is not entitled to any equitable relief, and that respondent has a complete remedy at law. (a) The bill ·is fatally defective of any equity showing on its face by failing to allege that the mortgagor Keith was wholly insolvent, so that if said sales be not set aside, respondent could not recover or realize the deficiency due on said notes, if any be due. If the mortgagor Keith was solvent then she had a perfect and complete remedy at law to sue said mortgagor Keith for the deficiency due on said notes, if any, and is not entitled to come into a court of equity at all. 2 Jones on Mortgages (6 Ed.), secs. 1227, 1228, 1670a; Hays v. Blackman (Cal.), 31 Pac. 745; Holdsworth v. Shannon, 113 Mo. 509; Cole Co. v. Madden, 91 Mo. 594; Humphreys v. Atl. Mill. Co., 98 Mo. 548; Benton Co. v. Morgan, 163 Mo. 677; Haydon v. Railroad, 117 Mo. App. 86; State ex rel. v. Evans, 176 Mo. 310. (b) It devolves upon respondent to state that a specific sum was due her from the mortgagor Keith, and which amount must be a greater sum than the amount realized on the sales to appellants, or else she shows no interest whatever to have the sales set aside even if the mortgagor was insolvent and that fact had been properly stated in the bill. Hence, we say for this reason respondent's bill fails to state a cause of action. (c) While respondent charges that the sale was made at an unusual hour, she does not charge that appellants knew such to be the fact; no fraud, collusion or surprise is charged against appellants and the sheriff in making the sale; mere inadequacy of con-

sideration of itself is no ground to set aside the sales to appellants. 2 Jones on Mortg. (6th Ed.), sec. 1670; Briant v. Jackson, 99 Mo. 585; Keith v. Browning, 139 Mo. 190. (d) Respondent fails to tender back to appellants the money they paid the sheriff; she only states that she returned the draft for the proceeds of the sale back to said sheriff, who was the agent of respondent and mortgagor Keith. "The purchaser also is entitled to be put into the same situation he was in before the purchase." 2 Jones on Mortg. (6 Ed.), sec. 1681; Sims v. Sims, 101 Mo. App. 407; Axman v. Smith, 156 Mo. 286. (e) The bill does not charge that appellants had any knowledge or notice that respondent had an agent on his way to bid on this land. The bill on its face shows that appellants are innocent purchasers without notice or wrong on their part. (f) Respondent states no reason why her agent was not present at the time the sale was made; the sale was made between the hours advertised; without some lawful excuse he had no right to ask even that the sale be held on his account; he does not plead that he knew any unusual hour and relied upon the sale not being made until such hour. As far as the bill states no excuse whatever is given for his seeming negligence which cannot help respondent in this cause. Story's Eq. Jur. (11 Ed.), secs. 141, 146, 147, 148; Brown v. Fagan, 71 Mo. 568. (g) Respondent does not ask in her bill that the sales be set aside and resales made; and that she will be at the resales and bid higher amounts than appellants had paid.

*Alfred Perkins* and *Howard Gray* for respondent.

(1) The petition alleges that the land was encumbered to secure a note exceeding $3,000 and that the property was worth at the time of the sale $4,000, and that the same was sold for less than $200, and that such price was grossly inadequate, as all the defend-

ants well knew, and if the plaintiff had been present at said sale, she would have prevented such sacrifice by bidding on the land, and that prior to the bringing of this suit there had been tendered to the purchasers all they were out at said sale, and that they had refused to accept the same and the plaintiff tendered such amount in court. This constituted a good cause of action. Plaintiff had the right to look to the real estate and the sale thereof under the terms of the deed of trust for the collection of her debt, and the sale in this case was at such a grossly inadequate price that it should have been set aside for this reason alone. Davis v. McCann, 143 Mo. 172; State v. Elliott, 114 Mo. App. 562. Sales under deeds of trust are harsh modes of foreclosing the rights of the debtor, are scrutinized into with great care, and will not be upheld unless conducted with all fairness, regularity and scrupulous integrity. Polliham v. Reveley, 181 Mo. 622; Stacey v. Smith, 68 N. W. 198; State v. Campbell, 60 N. W. 34; Holdsworth v. Shannon, 113 Mo. 508. (2) There is no misjoinder of parties defendant in this case. It is a suit to set aside a sale made by one of the defendants to the other two. The evidence shows that the land was all struck off to Neal. (3) The agent for respondent left Carthage in plenty of time to reach the place of sale, almost twenty-four hours before the usual time to sell property, and, without fault on his part, was delayed by the failure of trains to make connections. He took the precaution to send the sheriff a telephone message that he was delayed and not to sell the Keith property until after the morning train arrived. The telephone operator at Doniphan is positive that she notified the sheriff on the evening before the sale of this message and that she delivered him the message that he was not to sell the Keith property until the parties got in on the first train next day; that he had missed his train and could not get there until the next day. With

this information, it was the duty of the sheriff to have waited until the train arrived; instead of this, and according to his own testimony, about the time the train was whistling for Doniphan, he put the land up and sold it. (4) This property was sold at an unusual hour. This is a material point in this controversy. Taking into consideration the telephone message received by the sheriff to withhold the sale of the Keith land until the morning train arrived, the fact that the sheriff sold the land at just a few minutes before the train arrived, and the selling of the land at less than five per cent of its true value, and also the unusual hour at which this sale was made, the same was absolutely void, and a court of equity should not do otherwise but so declare. Holdsworth v. Shannon, 113 Mo. 508; Bank v. Richardson, 156 Mo. 270; Stoffel v. Schroeder, 62 Mo. 147; Cole Co. v. Madden, 91 Mo. 585; Montgomery v. Miller, 131 Mo. 595; Vail v. Jacobs, 62 Mo. 130.

LAMM, J.—Plaintiff, beneficiary under a deed of trust covering 1,360 acres of land, more or less, in Ripley county, Missouri, and securing an indebtedness of between $2,000 and $3,000, on the 8th day of February, 1905, brought her suit in equity against A. J. O'Neal, sheriff and acting trustee making a sale under said deed of trust, and George A. Neal and Thomas F. Lane, purchasers at such trustee's sale, the object and general nature of which was to set aside the sale and the deeds made to them. The decree, *nisi*, went in favor of plaintiff against all the defendants. The sheriff abides the decree. Neal and Lane appeal.

The petition alleges the execution and record of the deed of trust on the 23rd day of September, 1901, by one Keith and wife to Robert Moore, trustee for plaintiff, to secure notes made by Keith aggregating $3,144.80. That certain of the lands conveyed (describing several tracts) were in sections 7, 17, 18 and

19 in township 24, range 3. These lands comprised about 560 acres and for convenience will be called "tract A." Certain other lands conveyed (describing several tracts) were in sections 2, 10, 3, in township 23, range 1. The latter comprised about eight hundred acres and for convenience will be called "tract B." It is averred that the trustee nominated in the deed of trust refused to act and that at the request of the legal holder of the secured notes the acting sheriff of Ripley county, defendant O'Neal, acted as trustee under the powers and terms in the deed of trust and advertised a sale to take place on the 8th day of February, 1905. That on the day preceding the sale, plaintiff through her agent requested the sheriff not to sell the lands till the arrival of the Neeleysville train at Doniphan, the place of sale, so that she might be represented. That the said sheriff before noon and at an unusual hour and before the arrival of said train sold the lands in the absence of plaintiff or any one representing her and Lane and Neal became the purchasers, to-wit: said Lane of tract A at $35, and said Neal of tract B at $152. That the land was reasonably worth $4,000 and was sold at the aforesaid grossly inadequate price. That the train from Neeleysville arrived at Doniphan at about 11:30 a. m. on February 8th, 1905, and if the sheriff had postponed the sale until the arrival of said train plaintiff would have been represented at the sale and would have prevented the sacrifice of said lands by bidding thereon. That the sheriff and acting trustee tendered plaintiff the proceeds of said sale after deducting expenses, which she refused to receive. That in turn she offered to pay the expenses incurred in the sale and still offers and tenders the amount incurred by reason of such expenses. That a deed to the purchaser Lane has not been filed for record and plaintiff had no knowledge as to whether one had been executed.

There was no allegation in the bill that Keith was insolvent, or that plaintiff was without adequate remedy at law.

Defendants demurred to the bill on the grounds:

(a)    That by the showing made plaintiff is not entitled "to the recovery or relief prayed by the bill against these defendants."

(b)    That there is a misjoinder of parties defendant.

(c)    And a misjoinder of two causes of action in one count.

This demurrer was overruled and no exception saved.

Thereupon defendants filed the following motion:

"Now at this time come the defendants in the above-entitled cause and pray the court to make an order requesting the plaintiff to elect on which cause of action, the one against defendant Lane, or the one against defendant Neal, that plaintiff will proceed to trial in this cause."

Taken up, seen and heard, the motion to elect was overruled and the point was saved by an exception.

Thereupon the defendant Neal filed a separate answer, viz. : Admitting the execution of the mortgage, the refusal of the trustee to act, the request that defendant O'Neal act, and that he did act by duly advertising the land to be sold on the 8th day of February, 1905; averring that between the hours in the notice mentioned the sheriff offered the land for sale at public outcry and defendant Neal became the purchaser of tract B for the price of $152, which was all the land was worth at the date of sale by reason of other facts pleaded in the answer, to-wit: that in November, 1903, a judgment was rendered in the Ripley Circuit Court in a suit to quiet title wherein the mortgagor, Keith, was plaintiff and certain parties by the name of Schaffer and others were defendants. That said judgment found Keith was the owner of

tract B, but that the said Schaffers were entitled to a
first lien thereon for taxes paid in the sum of $468.92,
which lien was foreclosed and the lands ordered sold
to satisfy the judgment.   That in pursuance to that
judgment and order on the 7th day of November, 1904,
defendant Neal became the purchaser at an execution
sale at the price and sum of $957.96, and received a
deed therefor and was the owner of said land at the
date of the foreclosure of said deed of trust.   Denying
all other averments in the petition and alleging that
there was a misjoinder of parties defendant and of
causes of action in one count of the same petition, the
defendant prays to go hence without day and for costs
expended.

The defendant Lane answered, *pro se,* by a gen-
eral denial and certain admissions and averments,
viz. :   He admits that he bid off and purchased tract
A; avers that the ''price bid therefor was a reasonable
price for the same at said sale under all the facts and
circumstances surrounding the same.''   Further an-
swering, he states as follows:

''Defendant further answering, says that he is im-
properly joined with one George A. Neal in this suit,
that the lands bought by these defendants are sepa-
rate lands and that the defenses are separate and
distinct and they have no defenses or interest in com-
mon in said suit.

''Wherefore defendant prays the court to dismiss
this cause as to this answering defendant and for such
other orders as to the court seems right and just.''

The sheriff made answer admitting himself the
acting sheriff of Ripley county, Missouri, and denying
all other allegations.

The replication was conventional.

The case made on the facts is this:

It appears plaintiff is a widow and that she, as
well as the grantor and trustee in the deed of trust,
resided at Carthage, in Jasper county, and none of

them were present at the sale. We infer, too, that
J. L. Moore lives there. This J. L. Moore was em-
ployed by Mrs. Hanson to attend the sale as her agent
and look after her interests. It seems in journeying
by train from Carthage to Doniphan a change of cars
is made at Hoxie and another at Neeleysville. In
ample time to reach Doniphan on the day before the
sale, Moore left Carthage by rail, and, without his
fault, missed connections at Hoxie and again at
Neeleysville and lost 24 hours. The afternoon of Feb-
ruary 7th, 1905, found him at Neeleysville, from which
point a line of railroad ran to Doniphan. The last
train for that day had left for Doniphan before his
arrival. According to him, in this pickle he went to
the telephone office and sent a message to the sheriff
at Doniphan to the effect that he was at Neeleysville
and had missed his train; that he represented plaintiff
and asked the sheriff not to sell the Keith lands till
he arrived on the next morning's train. He took that
train for Doniphan on the day of sale and arrived there
a little before noon. Going at once to the sheriff's of-
fice he found that official and learned the land had been
sold. Inquiring if he had not got his message of the
day before, the sheriff replied that he was in the coun-
try when it came, but when he got home he was told
there was a message for him and he went over to the
office and got it, *"but that he didn't know exactly what
it referred to"*—*"it was not plain to him,* and that
he had sold the lands to the highest bidder."

Mrs. Mitchell testified she was a telephone oper-
ator at Doniphan on the 7th of February, 1905, and
received a message from Neelysville to deliver to de-
fendant O'Neal. The substance of it was to not sell
the "Keith property" till a certain party got in on the
first train next day—that "he had missed his train and
could not get here until the next day." She did not
remember whether the message disclosed what inter-
est the sender had in the sale and she did not know

by whom the message was sent. The sheriff came to the office in the afternoon of the same day and the message was delivered to him. On cross-examination she said the message contained a request about the "Keith property," to this effect: "Not to sell the Keith property until he got in on the next train—that he had missed his train at Neeleysville." She received it at three or four o'clock p. m. and delivered it to the sheriff an hour later.

As a further excuse for the early sale, the sheriff told Mr. Moore that "some parties who were going away on the next train wanted to bid on it, and for that reason *he had hurried the sale up a little in order for them to bid on the land and get away on the train.*"

The record shows the bidding was done in the name of the defendant, Neal, by one Choinski, and that though Neal was in town he was not present at the sale. As we grasp it, though the bidding was in the name of Neal it was on behalf of his co-defendant, Lane, they dividing the purchase as indicated by tracts A and B.

When Moore discovered the predicament of his principal, he at once went to Lane, Neal not being at hand, and talked with him. His version of that talk is as follows: "I stated to him all the circumstances connected with the matter about the plaintiff being a widow woman, and this money in the land represented the savings of a life time, and would leave her with nothing and that under the circumstances I thought it would be a generous act to simply let the deed be made over to her, and offered them, besides all the expenses, $25 to do it." But Lane was in a hurry and was also going away "on the next train." No conclusion was arrived at. Lane did not make a proposition and, on the same day, Moore entered suit.

The sheriff's account of his conduct of the sale and receipt of the message is, in substance, as follows: He sent the net proceeds, $167.10, by draft to the trus-

tee but it was returned and was in his possession at the trial. The land was sold at about 11:15 a. m., a few minutes before the morning train arrived from Neeleysville. It was knocked off to George A. Neal, the latter being present according to the sheriff. He denied receiving any notice from Moore, as representing Mrs. Hanson, requesting a postponement until after the arrival of the noon train. Being asked why he sold the land at the time he did, he replied: ''There were some parties who wanted to bid on this land and get away on the noon train''—that Choinski and Neal requested him to make the sale when he did in order that Neal, his wife and Choinski could go away on the 12 o'clock train. We gather from his testimony that he went around to parties usually bidding at sheriff's sales and took some pains to drum up a crowd of those who have an eye to bargains and are of mind to hazard a venture of that sort. He told these men the hour of sale and there were fifteen or twenty of them present when the land was knocked off—''as many as he ever saw at any sale outside of tax sales.'' There were other bidders than Choinski. Moore did not request a readvertisement and the sheriff did not recollect his asking if there was no way to sell the land over again. He testified he executed the deeds. At this point the court took a hand and the following happened:

''Q. That telephone message, how about that? A. I was out serving some papers that day, and when I got in my wife said they wanted me at central office, and I went up to the office and asked the girl if she had a message for me, and she said some one had called me up from Neeleysville, Missouri, and I asked her if she knew who it was from, and she did not, and then asked her what the message contained, and she said it was something regarding the sale of some land or property and wanted me to hold off the sale, or

something of the kind, and that was all she told me about it.

"Q. Wanted you to hold up the sale until the train got in? A. Yes, sir; something about that."

Being further pressed by plaintiff's counsel, he said the operator did not mention the "Keith property." Being asked if he had any other sales to take place on the 8th day of February, 1905, he said, No. Defendants' counsel then inquired as follows: "As a matter of fact you don't know, or didn't know, whether that message was about this land or any other land." To this he replied: "No, sir. I couldn't get much out of the girl about it."

Not only the clear weight, but substantially all, of the testimony (of which there was abundance) showed the usual time for making sheriff's sales, including trustees' sales, at the courthouse in Doniphan, unless by agreement of the parties, was in the afternoon from 1 to 3 o'clock. There was an exception to this rule, viz.: Where there were many sales to make on execution the sheriff sometimes took an early start in the forenoon in order to get through in the afternoon.

The usual divergence in witnesses' estimates on the value of land is in the case. Some for defendants, basing their evidence somewhat on the theory the title was clouded, put the value of the lands from twenty-five cents to $1 per acre. On their lowest estimate it was worth say $340. But we think the great weight of the testimony was to the effect that it was of an average worth of from $3 to $4 per acre, or, say, about $3,000.

An attempt was made by defendants to show that Keith's title was clouded. The testimony in that regard was not satisfactory. Some witnesses testified that he "dealt in bad titles." Certain deeds, by which he acquired title, were put in evidence to show he paid little for the land in 1893-6-7, some years before

he mortgaged it to plaintiff. A decree of the Ripley Circuit Court *in a suit brought since the execution and record of the deed of trust, and to which suit neither plaintiff nor the trustee under her deed of trust was a party,* was introduced in evidence establishing the title to tract B in Keith, but decreeing a lien and a foreclosure thereof in favor of parties by the name of Schaffer for certain taxes, and Mr. Neal was allowed to testify that he bought tract B under that decree at an execution sale prior to the trustee's sale and received a sheriff's deed for $610.

On this record it is earnestly argued by learned counsel that reversible error was committed: (1) In overruling the motion to elect; (2) in the admission and exclusion of testimony; (3) in that the decree is inequitable in not adjudging back to appellants their bid money; (4) further inequitable because plaintiff did not come into court with clean hands; and, further, because the testimony did not show Keith was insolvent—nor show any fraud, mistake, collusion or unfair dealing by appellants, or between them and the sheriff; (5) that the court erred in not sustaining defendants' demurrer to the bill; (6) and, finally, the bill is challenged because it does not state a cause of action in formulated particulars.

I. Any error in overruling the motion to elect was waived by answering over to the merits. The gist of that motion was a misjoinder of two separate causes of action. It runs on the theory plaintiff must be put to her election in proceeding either on the one against Neal, or the other against Lane. But, to keep life in the point, when that motion was overruled, movents should have proved their faith by their works, that is, by standing on their motion and exception and refusing to answer to the merits. Having joined issue on the merits, invoked a trial and taken their chances on such

joinder and trial, it is now too late to cut behind and open the closed question of misjoinder. [White v. Railroad, 202 Mo. 1. c. 561; Paddock v. Somes, 102 Mo. 1. c. 235; Hudson v. Wright, 204 Mo. 1. c. 424; Jordan v. Railroad, 202 Mo. 1. c. 426, *et seq.;* Aley v. Railroad, 211 Mo. 460.]

True, defendants sought to preserve the point by pleading a misjoinder of parties and of causes of action in their respective answers, but it may not be saved that way—at least, where the petition on its face discloses such defect, if any. [See authorities, *supra.*]

However, waiving that view, there is no soundness in the point. This, because plaintiff's cause of action grew out of one transaction, a joint venture of Lane and Neal—one sale and one bid, with deeds made to further their common enterprise in pursuance of that sale and bid. Lane received his conveyance by reason of a common understanding made before the execution of the deeds, and it was well enough to join him and Neal as parties defendant in one suit depending on the same evidence. The bill was not bad for multifariousness. There is mutuality in the subject-matter of the suit. [Bobb v. Bobb, 76 Mo. 419.]

The point is ruled against defendants.

II. Defendants assign error on the exclusion and admission of testimony. In this behalf, it must be kept steadily in mind that this is an equity case and that the exclusion or admission of testimony is rarely reversible error in chancery on appeal. The testimony being here, we can seek equity and do it by considering competent proof offered and excluded, or rejecting incompetent proof objected to and received. Three specifications are made under this head, viz.:

*First,* the admission of testimony looking to a compromise. As to that, we shall assume that no mote of prejudice got into the piercing and discriminating

eye of the learned chancellor, *nisi,* through that evidence.

*Second,* defendants sought to show by oral testimony from Moore that Keith and wife gave an additional mortgage on Carthage property to secure the Hanson notes and that the deed of trust on the Ripley county land was additional security. He was not permitted to testify and error is assigned on that score. As to that, it is apparent his ideas one way or the other were worthless for judicial purposes. If the fact was material, there was better evidence of it. He testified there had been a payment of about $1,200 on the secured notes. Counsel then asked: "Was that paid in cash or land?" An objection was sustained to that question and error is assigned. The relevancy of the question is not apparent. The ultimate fact to be got at was the payment, not how it was made.

*Third,* defendant Lane was on the stand. He testified he was an abstracter, of some five or six years' standing. It is not shown he was an attorney or learned in the law and, if that fact had appeared in proof, we shall not assume the chancellor was in need of enlightenment from him on what constituted a cloud on title. To depress the value of the land, the question was asked of Lane whether he "had any knowledge of the cloud on the title of this land?" He was not allowed to answer, and error is assigned. We are of opinion the ruling was well enough. Not only did the question assume a fact not proved by competent testimony, but the tendency of it was to allow the judgment of Mr. Lane to take the place of the fact itself. If the Keith title was really clouded and that fact affected the bidding, there was a way to prove the cloud. There is no such competent testimony in the record, and no man should be allowed to retain land bought at an invalid and unfair sale, by merely disparaging title through assumption or innuendo.

The point is ruled against defendants.

III.  It is next argued the decree is inequitable in not restoring to Lane and Neal their bid money. This is so.  On this record, on elementary equitable principles, if the land bought by their bid was taken from them, they as purchasers were entitled to be put into the same situation they were in before the purchase, so far as possible.  The chancellor should have seen to it that his decree did not stop half way, but went on and administered rounded-out justice on every material matter.  To that end, he should have decreed to them the return of the net proceeds of the sale held by their codefendant, O'Neal, and required plaintiff to reimburse to them the expenses of the sale, so that they be made whole in pocket.  That he who seeks equity must do equity as the price of his decree is a cardinal maxim steadily applied except when its application furnishes protection to wrong and fraud, as, for example, in Axman v. Smith, 156 Mo. 286.

IV.  It is next argued that plaintiff does not come into a court of equity with clean hands.  This argument is predicated of the fact that her agent, Moore, wanted to buy appellants' bargain, thereby (it is argued) disclosing a degree of moral turpitude in not only waiving an unfair sale at an unusual hour, but a resale in the interest of herself and her mortgagor. But plaintiff was guilty of no act of misfeasance, nonfeasance or inadvertence leading up to her predicament.  That nonplussed on the spur of sharp surprise, her agent cast about for a way out, and (absent counsel and principal) bethought him to throw a tub to the whale by offering the expenses of the sale and a bonus of $25 to allow the deed to be made to Mrs. Hanson, may show a fugitive spasm of forgetfulness of the equities of the situation, but does not bring her within the equitable doctrine relating to unclean hands.  She stands *rectus in curia* so far as concerns

her hands. Nothing came of the propostion and it was abandoned by the institution of this suit on the same day. If it had been accepted and the mortgagor was complaining, a different case would be here.

In this connection it is argued the testimony does not show the mortgagor was insolvent or show fraud, mistake or unfair dealing by appellants and the sheriff.

Let us see about that. There is testimony inferentially pointing to the fact that Keith, the payor in the notes, is insolvent. Defendants themselves introduced proof that his equity of redemption in some of his lands was sacrificed by a forced sale under a judgment against him. This is not an *indicium* of solvency, it squints the other way. Again, there was testimony that if this sale was not set aside the widow Hanson would lose the savings of a lifetime—all she had. Such testimony inferentially smacks loudly of insolvency. If, however, there was no necessity to plead insolvency, then there was none to prove the fact. This phase of the matter will be considered later.

On the other branches of the argument, it will suffice to say that, in and about this sale, the sheriff owed no duty to speculators in land titles. He had no call of duty to consult their convenience. The eye of duty should have been fixed elsewhere. Drumming up a crowd of speculators shows over zeal to make an appearance of fairness. The stiff rule of law is that he was the agent of the debtor and creditor. He lay, therefore, under the primary and bounden obligation to consult his *principals'* interests and convenience— not that of others. The right doctrine is nowhere more felicitously and justly stated than by WAGNER, J., in Goode v. Comfort, 39 Mo. l. c. 325, *et seq.* Speaking to the point, he there says:

"Trustees are considered as the agents of both parties—debtor and creditor—and their action in per-

forming the duties of their trust should be conducted with the strictest impartiality and integrity. They are entrusted with the important function of transferring one man's property to another, and therefore both reason and justice will exact of them the most scrupulous fidelity. Courts of equity have always watched their proceedings with a jealous and scrutinizing eye; and where it is clearly shown that they have abused their trust, or combined with one party to the detriment of the other, relief will be granted. Not that a sale made by them will be set aside on slight and frivolous grounds; but where it appears that substantial injury has resulted from their action, where, in pursuance of their powers, they have failed or neglected to exercise a wise and sound discretion, equity will interfere. It is impossible in the very nature of things to lay down any precise rule applicable alike to all cases which may arise, but every case must be decided on the especial facts and circumstances which surround it and upon which it is founded.''

How did this sheriff measure up to the foregoing standard of duty? Not at all. Let the record tell the story. At the instance of appellants he made the sale at an unusual hour—itself a badge of fraud in the absence of a request from the parties in interest. He made it in the teeth of a reasonable request from the mortgagee to await the usual hour. While inadequacy of consideration as a general rule is not of itself a distinct principle of relief in equity (1 Story Eq. (11 Ed.), sec. 245), yet in this instance he permitted the property to pass at so gross an inadequacy of price as to ''shock the conscience,'' and, when the conscience is shocked, the ear of the chancellor opens. [*Ibid*, sec. 246.] He did this at the request and to suit the by-ends (the so-called *convenience*) of bidders who were itching for a quick sale and a fetching bargain, and persuaded him to make it before the representative of the mortgagee could arrive from Neeleys-

ville. Not only so, but the mortgagor had a representative in Doniphan (Mr. Langford) who testified he was not present because of the untimely hour. The sale, then, was in very truth and fact made for the benefit of those who wanted to feather their own nests by sacrificing the interests of both mortgagor and mortgagee, and succeeded in doing that very thing. If such sale is not blinking all just ideas of *mine* and *thine,* if it is not unfairly taking the property of one man and giving it to another, what is it? To my mind, it is but paltering and toying with the situation to give any weight to the excuse of the sheriff that he did not ''understand'' the message from Neeleysville, and could not ''get much out of the girl about it.'' If he had given half the time and attention to grasping the significance of that message that he did to ignoring it and forgetting his duty as agent of the mortgagor and mortgagee, he would have understood and acted on it. If Mrs. Mitchell is to be believed, he knew the message related to the sale of the Keith property. If *he* is to be believed, it related to no other, because there was no other advertised. There is no testimony that Choinski, Neal and Lane would not have been represented at an afternoon sale. They were in Doniphan to attend that very sale. There is not a scintilla of testimony to show they would have left town before the sale. The chancellor, then, could well (and doubtless did) find that their anxiety to have the sale made under pretense of wanting to leave Doniphan at noon was a mere cloak for their real anxiety, to-wit, to have it over before the parties in interest, detained by a train of circumstances (or the circumstances of a train) reached the ground. Collusion in the form of wrongful combination for an improper purpose is shown, however tenderly the testimony be viewed. We have no trouble with the decree on that score, and, unless something else is in the way, it is buttressed on reason and authority. [Axman v. Smith, *supra;* Davis v. Mc-

Cann, 143 Mo. 172; Polliham v. Reveley, 181 Mo. 622; Holdsworth v. Shannon, 113 Mo. 508; Stoffel v. Schroeder, 62 Mo. 147; Vail v. Jacobs, *ibid,* 130.]

V. Of error assigned in the overruling of the demurrer, this may be said: No exception was saved to that ruling, but none was necessary. [Thorp v. Miller, 137 Mo. l. c. 239.] However, it is trite doctrine that a defendant waives his demurrer by answering over (Pickering v. Tel. Co., 47 Mo. 460), at least, as to every ground except a question of jurisdiction, or, except the 6th specification in the statute, Revised Statutes 1899, section 598. [Jones v. Railroad, 178 Mo. 528; Hudson v. Cahoon, 193 Mo. 547.]

Under the code, a demurrer must *specify* the grounds of objection. [R. S. 1899, sec. 599.] The 6th statutory ground of demurrer (sec. 598, *supra*), is: "That the petition does not state facts sufficient to constitute a cause of action." From my individual viewpoint, the demurrer in question does not with certainty make that specification. Its grounds are a misjoinder of parties and of causes of action coupled with this added, viz.: "That it appears by the plaintiff's own showing by said bill that she is not entitled to the recovery or relief prayed by the bill against these defendants."

In *technical* pleading, technicalities count. For is it not written that he that taketh the sword, may perish by the sword? It has been held that the use of the statutory language of the 6th ground of demurrer is a sufficient specification. In this instance, the pleader's language, liberally construed, may mean the same as the statutory language, and then again may not. The object of the statute was to sharply direct the trial court's mind to the precise ground of objection relied on. This, to treat the trial court fairly and subserve the will and purposes of the statute [R. S. 1899, sec. 864]. It is well, therefore, in demurr-

ing, to be plain about the grounds, to keep within the statutory way, as a beaten path; but from what follows in the next paragraph the point is not vital and hence is not decided.

VI.   It is argued the bill does not state facts sufficient to constitute a cause of action.   The point, in its nature, seems *jurisdictional* and is made in this court for the first time.   [Cantwell v. Lead Co., 199 Mo. l. c. 42; Hudson v. Cahoon, *supra*.]   When the trial began, there was no objection made to the introduction of any testimony because the bill did not state facts sufficient to constitute a cause of action.   At the end, there was no motion in arrest challenging the sufficiency of the petition.   In the absence of the one or the other or of a demurrer put on that *distinct ground,* it might be said defendants tried their case below on the theory the petition did state facts sufficient to constitute a cause of action, and that by raising the point for the first time in this court they, in effect, change their theory of the case on appeal; but as the question has been held jurisdictional we will consider it.

It is contended there are several vital omissions in the bill.   To our minds, the only serious one is the failure to allege the insolvency of the maker of the notes secured by the deed of trust.   Counsel stoutly argues such omission is equivalent to an admission that plaintiff has an adequate remedy at law.   He says that if the maker of the notes was solvent, so that the residuum of the debt could be collected by a suit at law on the notes, plaintiff is not entitled to have the breath of life breathed into her exhausted and defunct deed of trust by setting aside the sale and the deeds following it and, in effect, reinvesting into the trustee the legal title to the lands for the purposes of a landed security.

Is this position sound? To my mind, No. And this, because:

The general doctrine is thus put by Story (1 Story Eq. (11 Ed.), sec. 33): "Perhaps the most general, if not the most precise, description of a court of equity, in the English and American sense, is, that it has jurisdiction in cases of rights, recognized and protected by the municipal jurisprudence, where a plain, adequate, and complete remedy cannot be had in the courts of common law. The remedy must be plain; for, if it be doubtful and obscure at law, equity will assert a jurisdiction. It must be adequate; for, if at law it falls short of what the party is entitled to, that founds a jurisdiction in equity. And it must be complete; that is, it must attain the full end and justice of the case. It must reach the whole mischief, and secure the whole right of the party in a perfect manner, at the present time, and in future; otherwise, equity will intervene and give such relief and aid as the exigency of the particular case may require. The jurisdiction of a court of equity is, therefore, sometimes concurrent with the jurisdiction of a court of law; it is sometimes exclusive of it; and it is sometimes auxiliary to it."

The rule is announced tersely in 16 Cyc. p. 41, thus: "The existence of a remedy at law does not deprive equity of jurisdiction unless such remedy be adequate. By this is meant that it must be clear, complete and 'as practical and efficient to the ends of justice and its prompt administration as the remedy in equity.'"

It has been stated that: "The rule requiring that it should be shown that no adequate legal remedy exists would seem to be sufficiently complied with where the bill states facts from which it appears that such is the case. Where the fact that the remedy at law is inadequate sufficiently appears from the bill, it is unnecessary for it further to allege in terms the non-

existence of a legal remedy or its inadequacy.'' [18 Ency. Pl. and Pr., 110.]

In Martin v. Graves, 5 Allen 601, MERRICK, J., speaking to the adequate remedy at law, said: ''Whenever a deed or other instrument exists which may be vexatiously or injuriously used against a party after the evidence to impeach or invalidate it is lost, or which may throw a cloud or suspicion over his title or interest, and he cannot immediately protect or maintain his right by any course of proceedings at law, a court of equity will afford relief by directing the instrument to be delivered up and cancelled, or by making any other decree which justice and the rights of the parties may require.''

Testing the bill at bar by the foregoing general rules, it is clear that the point must be disallowed to defendants. Because:

This is not a suit to collect the secured notes. It is a suit to re-establish the lien of a deed of trust exhausted and lost by an unfair and wrongful sale. In other words, the result to be attained is to vest out of appellants and into the trustee (where it once was) the legal title to 1,360 acres of land, to be held as security for a debt due plaintiff. What *legal* remedy would plaintiff have to that end? None that I know of. (*Ubi jus, ibi remedium.*) Does it lie in the mouth of appellants to say in one breath: ''We got the land unfairly, the facts are against us on that proposition;'' and with the next, say: ''But the widow is only entitled to collect her debt—if she can get it on execution in a court of law, she has suffered no injury, *ergo,* we will retain from her what we have no right to?'' It would be droll and lame equity that would respond to such a *non sequitur.* The plaintiff started out with two remedies. She was entitled to both even in a case of solvency. Why should she lose either? One of them was a suit, a judgment, a *fi. fa.,* and sale. This remedy might be adequate or might not. No court can

peer into the future and see whether it would collect her debt. Verily! the vicissitudes of fortune are sharp and incessant and riches take wings and fly away! Who may know what a day will bring forth in that regard? Her other remedy lay on another road. She had a certain, continuous, permanent security on land —good for the *future,* free from the ups and downs of fickle fortune. The legal title to that land was put in a trustee for her use. Armed with that security she could realize on her notes by foreclosure sale or by a transfer of the paper to an indorsee. Disarmed of that security, it is beyond the ken of any earthly court to know whether she would recover a penny, though her debtor be technically solvent at the moment of trial. To say that the present solvency of the maker of the notes affords her an adequate, plain, complete remedy at law, attaining (in the language of the books) to the full end and justice of the case, reaching the whole mischief and securing her whole right, in a perfect manner, at the present time and in the future, is judicial nonsense in my opinion.

Take the case at bar. If it was necessary for plaintiff to allege the insolvency of Keith, then it was necessary to prove it. Suppose she failed in her proof? then the judgment would go against her on that theory. Her remedy in equity passed into a thing adjudicated —is gone. Now, why should these appellants, who have no right to a rood of the land, puzzle a court of justice with the insoluble problem of whether Mrs. Hanson would eventually suffer loss in the collection of her money on a *fi. fa?* A bird in hand is worth two in the bush, as the proverb saith. So, is not an existing, live, recorded real estate mortgage securing a note, for all practical purposes, worth a hundred guesses of any court on the probability of being able to collect that note on execution?

The averments of fact in her petition showed she had no adequate remedy at law. That was enough.

Why allege she had no adequate remedy at law when her bill showed it? The present solvency of Keith was no remedy coming up to the high-water mark of the rules laid down, therefore it was not necessary to allege his insolvency.

If appellants were innocent purchasers for value or had equities outside the return of their bid, if they were not wrongdoers and their covin did not suffocate their right, another question might be here.

The logic of Axman v. Smith, *supra,* is with the conclusion announced. There, insolvent mortgagors sued to set aside an unfair mortgage sale. They were met with the proposition that they were confessedly insolvent and their bill did not offer to redeem. It was sought to defeat recovery on the strength of the maxim that he who seeks equity must do equity. Impliedly, at the very root of the argument used was the proposition that those insolvent mortgagors were not injured by the unfair sale. Judge VALLIANT, in disposing of the point, among other things, said: "But those facts do not absolve the trustee from his duty, nor destroy the plaintiffs' rights to have the property sold to the best advantage according to the terms of the deed of trust, to the end that it will go as far as may towards the payment of their debts. That is a right they have for their own interest and a duty they owe to their creditors."

If mortgagors, independently poor and insolvent and therefore on the surface measurably immune from injury by an unfair mortgage sale, may go into equity, why may not a mortgagee who peradventure with good luck might collect his debt at law, go into a court of equity to have restored to him the real estate security of which he was wrongfully deprived?

The authorities point out that there are cases alone cognizable in equity and with which the law has nothing whatever to do. The jurisdiction of equity

is said to be exclusive in such cases. Then there is a class of cases in which the jurisdiction of equity is concurrent with that of courts of law. Then another class in which equity has jurisdiction because of the inadequacy of the remedy at law, and still others in which the chancery side of this court is invoked in aid of an existing remedy at law. The case at bar naturally falls in that class of which equity alone has jurisdiction. But the bill may be sustained on the theory also, as said, that the remedy at law is wholly inadequate as that term is defined in the books.

Since writing this opinion in division my attention has been called to Thorn & Hunkins Lime & Cement Co. v. Citizens Bank of St. Louis, 158 Mo. 272. That was a suit in equity to subject a fund in the treasury of the city of St. Louis to the payment of claims for material furnished by the lime and cement company to a contractor. A contractor's bond was outstanding giving a remedy at law. It was contended there was an adequate remedy at law by a suit against third parties, to-wit, the sureties on the bond, precisely as it is contended here there is an adequate remedy at law by a suit against a third party, to-wit, the payor of the note, Keith. In disallowing that contention this court, speaking through VALLIANT, J., used language in point and said:

"The first point advanced by appellant is that the plaintiff has no right to maintain this suit in equity because it has an adequate remedy at law on the bond executed by the construction company to the city.

"The rule that equity will not grant relief where there is an adequate remedy at law applies only when on the case stated there is a legal remedy.

"A distinction is to be observed between a case cognizable at law but for which the law has no adequate remedy, and a case that can be adjudicated upon its merits only in a court of equity; in the one the equity court is invoked only for a remedy, in the other for

an adjudication of the rights of the parties on the facts. A distinguished writer on this subject would class the one under the head of equity jurisprudence and the other under that of equity jurisdiction. [Pomeroy, Eq. Jur., sec. 131.]

"If on the facts stated the case is of a nature cognizable only in a court of equity the plaintiff will not be shut out of that court on the suggestion that on another state of facts he might recover that which would be equally satisfactory in another tribunal. If one has a mortgage on certain land for his debt, equity will not refuse to hear his suit for a foreclosure upon the suggestion that his debtor is solvent and the debt can be collected through a judgment and execution at law. If the right asserted is a subject of original equity jurisdiction the court will entertain it even though there may be a remedy at law. [Stewart v. Caldwell, 54 Mo. 536; Pratt v. Clark, 57 Mo. 189; Real Estate Sav. Inst. v. Collonious, 63 Mo. 290; Story, Eq. Juris., sec. 80.] And the fact that a plaintiff may have a remedy by suit at law against a third person, as in this case against the surety on the bond, is no ground for refusing relief in equity. [Roll v. Smelting Co., 52 Mo. App. 60.]

"The right which the plaintiff seeks to establish in this suit is in its nature such as can be established only in a court of equity . . .

"Nor does the fact that a suit by the plaintiff on the bond was pending when this cause was tried affect the plaintiff's right to maintain this action. That suit was of a different nature, having a different purpose from this and between other parties."

Appellants' learned counsel strongly relies on Benton County v. Morgan, 163 Mo. 661, but that case is not in point. There, the mortgagor and the mortgagee, in a school mortgage, jointly sued to set aside an irregular sale. It was held, in effect, that the sale being utterly void the mortgagor had a legal remedy

in ejectment. It was held that as the sheriff had no certified copy of the order of foreclosure, and as such certified copy under the statute took the place of a *fieri facias*, that, absent such *fi. fa.*, he had no authority to sell. That no title passed and therefore there was no use to invoke equitable aid to undo that which was absolutely void. In other words, the county could sell over again. It will be seen that the legal remedies in the way of relief in that case related to the very thing sought. In the case at bar, the alleged remedy at law relates to a right not directly in suit, to-wit, the incidental matter of the collection of the note.

The amount of appellants' bid was shown to be $187. The sheriff has in his hands $167.10. For the reasons pointed out in paragraph 3 of this opinion the decree was inequitable in not returning appellants their bid.

The premises considered, the cause is reversed and remanded with directions to enter a decree setting aside the trustee's sale, re-establishing the deed of trust as a live security, and cancelling and annulling the deeds of Lane and Neal, on condition that plaintiff within sixty days cause to be deposited with the clerk of the Ripley Circuit Court for appellants' use $19.90, to cover the expenses of the sale. It is further directed that the court order and adjudge the defendant O'Neal to turn over to his codefendants, appellants, the aforesaid net proceeds of the sale now in his hands.

*Graves, J.,* concurs. *Woodson, J.,* dissents as to the fifth and sixth paragraphs of the opinion. He is of opinion that the cause should be reversed and remanded with permission for plaintiff to amend by alleging the insolvency of the maker of the notes and the absence of remedy at law. *Valliant, P. J.,* absent. A majority of this Division not concurring, the cause is sent to Banc.

PER CURIAM.—On reconsideration in Banc the divisional opinion of LAMM, J., was adopted as the opinion of the court. All concur. The cause is reversed and remanded with the directions there given.

## ON MOTION FOR REHEARING.

PER CURIAM.—On motion for rehearing and on motion to modify direction to enter judgment, *nisi*.

The motion for a rehearing is overruled. It appearing that plaintiff repaid to the sheriff the expenses of the trustee's sale and that by inadvertence that fact was not shown by the record, the directions to the court below will be modified by eliminating the clause requiring plaintiff to deposit with the clerk of the circuit court within sixty days $19.90, for appellants' use, to cover the expenses of the sale, and further modified so as to require the court to enter a decree requiring the sheriff to return to appellants their whole bid of $187 now in his hands.